UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Charles Shi,

                                                    Plaintiff,                    **Report and Recommendation**

                                                                                        19-CV-339V

                              v.

Moog Inc. and
Moog Control System (Shanghai) Co. Ltd.,

                                                    Defendants.

_____

## I.     INTRODUCTION

         Around June 2015, plaintiff Charles Shi noticed that his employer, Moog Control System

(Shanghai) Co. Ltd. ("Moog Shanghai"), was buying parts for United States military airplanes from a

Chinese supplier that was cutting corners and hiding the fraud with false documentation.  Plaintiff

became concerned that the defective parts could have catastrophic consequences for anyone

operating the airplanes after they were delivered to the United States Department of Defense.

Plaintiff raised his concerns with his immediate supervisor and was ignored.  Plaintiff went up the

corporate ladder and raised his concerns with officials at Moog Shanghai's parent company, Moog

Inc. ("Moog") in Elma, New York.  An internal investigation ensued that at least partially

substantiated plaintiff's concerns but downplayed any impact on safety.  Plaintiff then alerted the

CEO of Moog to the problem.  One day after contacting the CEO, plaintiff was fired.

         Plaintiff now brings suit against Moog and Moog Shanghai for retaliatory discharge in

violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3731.  Moog has appeared in the case;

Moog Shanghai has not.  Following transfer to this District from the Middle District of Florida,

Moog filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt.

No. 19.)  In short, Moog argues that plaintiff has not adequately pled how poor quality parts from a

parts supplier in China could lead to a fraudulent claim for payment on the United States. Moog argues further that it could not have retaliated against plaintiff because plaintiff did not adequately inform it of the possibility of litigation under the FCA. Finally, Moog argues that all of the events that plaintiff has alleged occurred in China and that the FCA has no extraterritorial effect there. Plaintiff counters that his amended complaint, the current operative pleading, sets forth how the fraud that he admittedly uncovered in China would ultimately have domestic effect in the United States, making extraterritoriality a non-issue. Plaintiff also asserts that he has pled cognizable efforts to stop FCA violations and that Moog was aware of his efforts no later than the time of the internal investigation.

District Judge Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 30.) The Court has deemed the motion submitted on papers under Rule 78(b). For the reasons below, the Court respectfully recommends denying Moog's motion.

## II. BACKGROUND

This case concerns allegations[1] that Moog and Moog Shanghai fired plaintiff because he complained about defective parts making their way into airplanes built for the United States Department of Defense. Plaintiff is a resident of China. From 2006 until January 13, 2016, plaintiff worked as a Supply Chain Manager in the Aircraft Group at Moog Shanghai. Moog Shanghai is a subsidiary of Moog Controls Hong Kong Ltd., a Hong Kong corporation. The Hong Kong corporation, in turn, is a subsidiary of Moog, which is headquartered in Elma, New York. Based on a Department of Labor document in the record, the relationship between the corporate entities mentioned above looks something like this:

---

[1] For the sake of brevity, the Court in this section will avoid repeated use of the words "alleged" or "allegedly" when describing the assertions made in the amended complaint. Nothing in this section constitutes a factual finding unless otherwise noted.



(Dkt. No. 19-4 at 21.)  The amended complaint contains little detail about what Moog actually does for the Department of Defense, but a basic supply and manufacturing chain is apparent.  Moog Shanghai obtains airplane parts from various Chinese companies.  Moog Shanghai, with some level of coordination or supervision from Moog, then manufacturers airplanes as a subcontractor of The Boeing Company ("Boeing").  Whether Moog and its subsidiaries manufacture the unspecified airplanes in whole or in part is not clear from the amended complaint.  Ultimately, though, Boeing delivers the finished airplanes to the Department of Defense under various contracts that Boeing has with the federal government.

The events that led to this litigation began in 2015 and related to one particular parts supplier for Moog Shanghai, a company called Suzhou New HongJi Precision Parts Co., Ltd. ("NHJ").  NHJ made spoiler blocks for Moog's airplanes:

Spoiler blocks hold the spoiler actuator, which in turn control[s] an airplane's spoilers. Spoilers are metallic flaps that deploy from an airplane's wing to create drag and reduce speed. Flight spoilers are deployed mid-flight to control the lateral movement of the aircraft. Ground spoilers, used in conjunction with flight spoilers, are deployed during landing to slow the aircraft after returning to the ground.

Spoiler blocks are considered a Single Point of Failure (hereinafter "SPOF") component due to the fact that failure of such a piece could lead to a catastrophic failure and fatal crash.

Spoiler blocks are classified as safety critical components.

NHJ also manufactures safety sensitive parts including the manual release, unions, transfer tubes, springs, pins, brackets, and connector plates for securing electrical wires.

(Dkt. No. 9 at 6.) Around June 2015, plaintiff became concerned that NHJ was passing along "counterfeit parts" to Moog Shanghai at full price and falsifying related documentation—presumably to create a false impression that the parts met necessary specifications. By "counterfeit," plaintiff appears to mean that "NHJ outsourced Moog machined parts to an unknown supplier and that [the] NHJ subcontractor did not properly bake parts both before and after the cadmium plating process, and forged production process cards, and the improperly baked parts consisted of four different part numbers." (*Id.* at 12.) The amended complaint is not quite clear as to how plaintiff first noticed a potential problem, but around June 2015, he "noted a complete loss of material traceability, which included a pattern of unapproved metals, metallurgical processes, failure to properly document the source of metals used in production, and falsification of such records." (*Id.* at 7.) Plaintiff alerted his immediate supervisor, Joe Zou, and "suggested changes to the relationship with NHJ to remedy illegal manufacturing processes." (*Id.*) Zou "refused to conduct an investigation into Plaintiff's concerns and discouraged Plaintiff from any further investigation or disclosures." (*Id.* at 8.) Zou's refusal to investigate prompted plaintiff to push his concerns up Moog's corporate structure. On August 7, 2015, plaintiff sent an email message to Kevin Walek,

Moog's Global Supply Chain Director at headquarters in Elma. An internal investigation ensued. The internal investigation found evidence of false documentation that concealed substandard manufacturing. (*Id.* at 10.) Nonetheless, officials at Moog and Moog Shanghai downplayed the problem. Zou "knew of traceability issues, but dismissed them without action because he believes the illegal practice is widespread among other Chinese manufacturers and was not serious enough to warrant his attention." (*Id.*) Other officials "failed to discover any reason that a part may be ineffective, and falsely characterized all parts by NHJ as minor parts without a substantial impact on safety." (*Id.*) In response, plaintiff informed Zou and others that he intended to notify the Federal Aviation Administration. (*Id.*) On January 12, 2016, plaintiff relayed his concerns by email to John Scannell, Moog CEO. (*Id.*) On January 13, 2016, Zou fired plaintiff. (*Id.*) Plaintiff was induced to sign a termination agreement on the pretense that his termination was part of a corporate restructuring. (*Id.* at 11.) The restructuring never happened. (*Id.*) Plaintiff was under contract through December 31, 2019. (*Id.*; *see also* Dkt. No. 24-1 at 3.)

Plaintiff commenced this case by filing his original complaint in the Middle District of Florida on January 11, 2019. (Dkt. No. 1.) On March 11, 2019, plaintiff filed his amended complaint (Dkt. No. 9) and asked to have the case transferred to this District (Dkt. No. 10). The amended complaint contains one claim of retaliation in violation of the FCA. According to plaintiff, he "was acting in furtherance of efforts to stop potential violations of the FCA—namely, the delivery of airplanes to the United States Department of Defense containing substandard materials and illegal defects from counterfeit parts manufactured by NHJ." (Dkt. No. 9 at 13.) Nonetheless, "[p]laintiff's actions in bringing the truth about Defendants' fraud to the attention of his superiors caused a hostile work environment that led to retaliatory termination for Plaintiff." (*Id.*)

Moog filed the pending motion on June 20, 2019. According to Moog, plaintiff "alleges no facts linking NHJ's alleged fraudulent sale of parts to the submission of any suspected or actual false claims for payment to the United States. Nor does Shi allege that he was investigating any such false claims." (Dkt. No. 19-1 at 6.) Specifically, "The crux of [plaintiff's] concerns related to NHJ's supposedly illegal and deficient manufacturing processes for commercial airplane parts it was supplying to defendants, and possible collusion between Zou and NHJ. Shi admits he was concerned only with the 'issue of traceability and potentially fraudulent documentation.' Docket No. 9 ¶ 42. These factual statements make clear that Shi's concern was **not** 'the employer's knowing submission of false or fraudulent claims for payment to the government.' At most, they suggest Shi was attempting to expose a fraud **on** defendants themselves and ensure the **supplier's** compliance with FAA regulations. This is not FCA-related conduct or inquiry and, thus, is not protected." (*Id.* at 16 (citation omitted).) Moog argues further that plaintiff did not engage in protected conduct because the amended complaint contains "no alleged communications or other disclosures pleaded that would have reasonably put Moog on notice that Shi was contemplating a *qui tam* action against it. He never complained or raised concerns that Moog was actually or potentially perpetrating a fraud on the government and, without this information, Moog could not have formed the retaliatory intent required by the FCA." (*Id.* at 19; *see also* Dkt. No. 29 at 6–7.) Moog also notes that plaintiff's assertions contain factual contradictions and that the FCA does not authorize the damages that plaintiff has requested. Finally, Moog argues that all events relevant to plaintiff's retaliation claim occurred in China and that the FCA lacks extraterritorial reach.

Plaintiff opposes the pending motion in all respects. Plaintiff notes that the fraud that he allegedly uncovered "showed that airplane parts supplied by Defendant Moog, Inc. to Boeing and ultimately to the United States Department of Defense were at risk for possible catastrophic failures.

*See* Am. Compl. ¶ 32-40.  The United States government was paying for airplanes that, because of

Defendant's intentional and/or reckless conduct, were at risk for possible catastrophic failures due

to fraudulent and illegal manufacturing processes.  *See* Am. Compl. ¶ 32-40."  (Dkt. No. 28 at 5.)

Plaintiff next argues that protected conduct under the FCA does not require a formal inquiry under

that statute or an explicit intent to start one:

> Defendant also argues that the Amended Complaint fails because Shi fails to
> allege any FCA-related inquiry or conduct.  This argument misreads the Amended
> Complaint and misstates the law.  The plain text of the statute as well as the
> legislative history show that the 2009 amendments to the False Claims Act statute
> sought to define broadly what constitutes "protected activity."  The new statutory
> language under Section 3730(h) makes it clear that Section 3730(h) protects not only
> actions taken in furtherance of a potential FCA claim, but also steps taken to remedy
> fraud through other means, such as internal reporting and refusal to participate in the
> illegal activity.  *See* 155 Cong. Rec. E1295, E1300 (daily ed. June 3, 2009) (extension
> of remarks) (statement of Cong. Berman).

(*Id.* at 6.)  The assertions in the amended complaint, according to plaintiff, "adequately allege that

Moog, Inc. was aware that he was engaged in protected conduct."  (*Id.* at 7.)  As for retaliatory

motive, "[o]n January 12, 2016, Plaintiff expressed his concerns regarding the illegal manufacturing

via email to John Scannell, CEO of Moog, Inc.  *See* Am. Compl. ¶ 68.  This email was first sent to

Moog, Inc.'s HR department as was their policy.  *See* Am. Compl. ¶ 68.  The very next day, on

January 13, 2016, Plaintiff was terminated."  (*Id.* at 12.)  Finally, plaintiff stresses that

extraterritoriality will not be an issue here:

> Shi was employed by Moog, Inc. from 2006 until his termination on January
> 13, 2016.  See Am. Compl. ¶ 12.  Moog, Inc. is headquartered in New York.  *See* Am.
> Compl. ¶ 14.  As part of his employment duties, Shi was in charge of overseeing the
> Supply Development Engineers for Moog, Inc. in the People's Republic of China.
> *See* Am. Compl. ¶ 10.  Shi reported to Moog, Inc. corporate offices in Elma, New
> York.  *See* Am. Compl. ¶ 11.  Shi initially reported the fraud to his direct supervisor,
> Joe Zou, who relocated from Moog, Inc.'s New York office in 2013 to serve as
> Moog, Inc.'s Asia Supply Chain Manager.  *See* Am. Compl. ¶¶ 27, 28, 45.  Shi then
> reported his findings to Mr. Kevin Walek, Global Supply Chain Director of Moog,
> Inc., based at Moog headquarters in New York.  *See* Am. Compl. ¶ 49.  Shi then
> reported the fraud to the CEO of Moog, Inc., Mr. John Scannell, at Moog, Inc.

headquarters in New York. *See* Am. Compl. ¶ 68. Defendant Moog, Inc. made the decision to terminate Shi only 24 hours after he disclosed his findings about the fraudulent manufacturing to Moog, Inc.'s CEO in New York. *See* Am. Compl. ¶ 68-70. The conduct at issue underlying Shi's claim of retaliation occurred in the United States, and therefore, extraterritoriality is not an issue in the instant case.

(*Id.* at 16–17.)

## III. DISCUSSION

### A. *Motions to Dismiss Generally*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). Courts assess Rule 12(b)(6) motions "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 61 (2d Cir. 2010) (internal quotation marks and citation omitted). "On a motion to dismiss, the court may consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001) (editorial and internal quotation marks and citation omitted). "Simply stated, the question under Rule 12(b)(6) is whether the facts supporting the claims, if established, create legally cognizable theories of recovery." *Cole-Hoover v. Shinseki*, No. 10-CV-669, 2011 WL 1793256, at *3 (W.D.N.Y. May 9, 2011) (internal quotation marks and citation omitted).

As a preliminary matter, the Court must decide whether to consider a number of documents that have become part of the record but lie outside of the amended complaint. "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials. Generally, we do not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation and editorial marks and citation omitted). "Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint. However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citations omitted). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect. Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough. In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Goel*, 820 F.3d at 559 (internal quotation and editorial marks and citations omitted).

Applying this standard, the Court has considered two of the documents in the record for limited purposes. The record contains a copy of what appears to be an agency decision from the

Department of Labor addressing allegations that plaintiff made to the Occupational Safety and Health Administration.  (Dkt. No. 19-4.)  As indicated above, the Court has copied the simplified diagram in that decision (*id.* at 21) that sketches the part of Moog's corporate structure that is relevant to and referenced in the amended complaint.  The Court is relying on the diagram for the limited purpose of showing qualitatively that Moog Shanghai ultimately is a subsidiary of Moog.  The record also contains a copy, filed under seal, of the employment contract that plaintiff had with Moog Shanghai.  (Dkt. No. 24-1.)  Since the amended complaint lists plaintiff's title and employment dates under the contract, the Court has relied on the contract for the limited purpose of confirming plaintiff's title and term of employment.  The Court finds that further reliance on the employment contract or on the agency materials in the record will not be necessary.  Moog has not argued that any agency proceedings involving the same or similar factual allegations would have any sort of collateral estoppel effect here.  Although allegations in the amended complaint refer to events that purportedly are explained in greater detail[2] within the documents, the documents themselves are not integral to the basic assertion of any of plaintiff's claims.  At most, the documents are evidence, and "[t]he court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) (citation omitted).

## B.  Retaliation Under the FCA

The Court next will address the legal sufficiency of plaintiff's substantive allegations.  "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee,

---

[2] The Court will note, without further comment at this time, one observation from the agency proceedings that might require attention as this case proceeds to discovery: Plaintiff's apparent "lack of willingness to travel to American territory due to Chinese law and anticipated reprisal by Chinese authorities."  (Dkt. No. 19-4 at 20 n. 29.)

contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). "Although this Court has yet to articulate a test for deciding when a plaintiff has set forth a claim for retaliation under section 3730(h), district courts in this Circuit, as well as our sister circuits, have generally required a plaintiff to show that (1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017) (internal quotation marks and citations omitted). The FCA retaliation provision contains several terms that fit the district-court test that has evolved so far and act as prerequisites to a plausibly stated claim. The Court will examine each of those terms.

> i. *"Employee, Contractor, or Agent" and "Discharge"*

The parties do not dispute that plaintiff was an employee of Moog Shanghai or that he was discharged on January 13, 2016. Plaintiff has sued Moog Shanghai, and Moog Shanghai so far has not appeared. Can plaintiff, however, also be considered an employee or agent of Moog? For Rule 12 purposes, and subject to later discovery, the answer has to be yes. Plaintiff has asserted in his amended complaint that he was employed by Moog and that he reported to Moog headquarters in Elma. (Dkt. No. 9 at 3.) The copy of plaintiff's employment contract in the record suggests that Moog Shanghai was the literal corporate signatory. (Dkt. No. 24-1 at 3.) Nonetheless, Moog Shanghai is a subsidiary of Moog, and discovery plausibly could confirm a day-to-day working relationship with Moog that would suffice to make plaintiff an employee or agent of Moog for

purposes of Section 3730(h)(1). *Cf. United States ex rel. White v. Gentiva Health Servs.*, No. 3:10-CV-394-PLR-CCS, 2014 U.S. Dist. LEXIS 86156, at *46 (E.D. Tenn. June 25, 2014) ("Ms. White has made direct allegations against Gentiva. She alleged a number of individuals holding different job titles within the Gentiva organization executed several fraudulent schemes. Whether these employees perpetrating a fraud against the government were employees of Gentiva or employees of one of Gentiva's subsidiaries is a question of fact inappropriate for a motion to dismiss under Rule 12(b)(6)."); *Dimitroyannis v. Kavadi*, No. H-13-0752, 2013 U.S. Dist. LEXIS 193224, at *6-7 (S.D. Tex. Oct. 9, 2013) ("Because McKesson addresses and provides evidence only that it is not a direct employer of Plaintiff nor challenged Plaintiff's failure to plead sufficient facts to determine McKesson's control over its subsidiary's employment decisions nor provided evidence of its own regarding such control or lack thereof, the Court denies its motion."). Plaintiff also has pled that Zou came to Moog Shanghai from Erie County and that internal investigations of his allegations were coordinated from Moog. *See Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2016) (addressing "joint employer" and "single employer" doctrines). Plaintiff thus satisfies the employment or agency prerequisite.

### ii. *"Lawful Acts"*

The Court mentions this term briefly because it does appear in the retaliation statute. The parties, however, do not dispute that plaintiff's actions to alert his superiors to counterfeit parts were lawful.

### iii. *"Furtherance of an Action" or "Other Efforts to Stop 1 or More Violations"*

Plaintiff has to plead more than general lawful acts that prompted retaliation; he must plead lawful acts done "in furtherance of an action under this section or other efforts to stop 1 or more violations" of the FCA. A successful pleading in this regard will satisfy any requirement that

plaintiff engaged in protected activity.  "[A]n employee need not complete an investigation into potential fraud or uncover an actual FCA violation to undertake protected activity.  The FCA's anti-retaliation provision protects employees while they are collecting information about a possible fraud, before they have put all the pieces of the fraud together." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399 (6th Cir. 2015) (unpublished opinion) (citations omitted); *see also Garcia v. Aspira of New York, Inc.*, No. 07 CIV. 5600 PKC, 2011 WL 1458155, at *4 (S.D.N.Y. Apr. 13, 2011) ("Accepting plaintiff's allegations as true, evidence that the defendant included false expenses in budgets utilized in connection with government grant applications would form a reasonable basis for bringing a *qui tam* action under the FCA.  Therefore, for purposes of this motion to dismiss, plaintiff's observations and his confrontations with defendant establish that he has engaged in protected conduct.") (citations omitted).  With respect to "other efforts" to stop violations, "[a]n employee need not have actual knowledge of the FCA for her actions to be considered protected activity under § 3730(h).  If so, only those with sophisticated legal knowledge would be protected by the statute . . . . We agree with several of our sister circuits, which have held that the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479–80 (7th Cir. 2004) (internal quotation marks and citations omitted); *compare United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 38 (D.D.C. 2003) ("All that is required is that an employee be investigating false or fraudulent claims aimed at extracting money from the government.") (citations omitted) *with Adiram v. Catholic Guardian Servs.*, No. 13-CV-6235 SLT JO, 2015 WL 5706935, at *5 (E.D.N.Y. Sept. 28, 2015) (dismissal warranted

where "Plaintiffs were apparently motivated by concerns about the health and safety of their residents [who had developmental disabilities], not by financial fraud").

Here, plaintiff has pled facts that plausibly show reasonable efforts to uncover fraud or other conduct that would violate the FCA. According to the amended complaint, plaintiff became aware that NHJ "did not properly bake parts both before and after the cadmium plating process, and forged production process cards, and the improperly baked parts consisted of four different part numbers." (Dkt. No. 9 at 12.) Plaintiff noticed further that NHJ tried to cover up its substandard manufacturing with fraudulent documentation that its spoiler blocks met all necessary specifications. *Cf. United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 643–44 (6th Cir. 2002) ("Although the loss of Aircraft 89-0165 occurred after Government acceptance and resulted from the defective Speco gear, it was actually caused by Boeing's initial misrepresentation that the helicopter conformed to contract requirements. This misrepresentation, which triggered FCA liability, is the key to this case."). A reasonable inference from this allegation is that NHJ wanted to be paid full price for substandard work, creating a cascade effect in which Moog Shanghai, Moog, Boeing, and ultimately the Department of Defense would all pay full price for what they thought were military airplanes that met all required specifications. Another reasonable inference from plaintiff's allegations is that if the Department of Defense knew about planes containing defective spoiler blocks then it either would not purchase the airplanes at all or would demand repairs and a significantly lower price. *Cf. United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1013 (9th Cir. 2001) ("On the facts of this case, it is clear that if Northrop had not agreed to replace and repair the faulty FDTs [flight data transmitters] and replace the defective damping fluid, the government would have had to pay to cure the problem. The value of the 'proceeds' of the Air Force Agreement is therefore the amount the government would have had to pay to Northrop, or to some other contractor if that amount would

14

be less, to cure the problem that Northrop agreed to cure in the Agreement."). Plaintiff reported his concerns to his immediate supervisor, Zou. Zou ignored plaintiff and refused to investigate, possibly because "he believes the illegal practice is widespread among other Chinese manufacturers and was not serious enough to warrant his attention." (Dkt. No. 9 at 10.) *Cf. United States v. Hawley*, 619 F.3d 886, 895–96 (8th Cir. 2010) ("Drawing all justifiable inferences in the government's favor, we believe a reasonable jury could find that Hawley intended, based on his experience selling federally reinsured crop insurance for NCCI, that NCCI would transmit a farmer's claim to the FCIC for reimbursement, and the FCIC would rely on that claim as a condition of payment. This sequence closely resembles the subcontractor analogy described in *Allison Engine [Co. v. United States ex rel. Sanders, 553 U.S. 662 (2008), superseded by statute, Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009)]*, namely, that a subcontractor is liable under § 3729(a)(2) if he submits a false statement to a prime contractor intending for the statement to be used by the prime contractor to get the government to pay the prime contractor's claim.") (citations omitted); *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) ("[A]n employee may put her employer on notice of possible False Claims Act litigation by making internal reports that alert the employer to fraudulent or illegal conduct . . . . [Relator's] allegations that she complained about the defendants' 'unlawful actions' and warned them that they were 'incurring significant criminal and civil liability' would have been sufficient, if proven, to support a reasonable conclusion that the defendants were aware of the possibility of litigation under the False Claims Act.") (citations omitted). When Zou ignored him, plaintiff continued to work his way up the corporate structure until he contacted officials at Moog including the CEO himself. Internal investigations at least partially confirmed plaintiff's allegations. By this time, Moog was aware of potential fraudulent activity and plaintiff's efforts to uncover it. "Plaintiff also informed Defendants

15

that he intended to notify the FAA [Federal Aviation Administration]." (Dkt. No. 9 at 10.) *Cf.*
*Schuhardt v. Wash. Univ.*, 390 F.3d 563, 567-68 (8th Cir. 2004) ("Viewing the evidence in the light
most favorable to Schuhardt, and drawing all inferences in her favor, we conclude that there is
sufficient evidence that Schuhardt's activity was in furtherance of a *qui tam* action. Specifically,
Schuhardt perceived a mass effort to modify patient records months after a procedure had occurred.
She explained that doctors signed reports without reviewing files. She advised her supervisor that
the activity may be fraudulent and illegal. She also mentioned to the supervisor that a government
agency would forbid the practice if it was aware of it. Schuhardt complained to the University over
its confidential hotline. Then, when the billing practice remained unchanged, she copied files that
she believed to be evidence of fraud."). One day after contacting Moog's CEO, plaintiff was fired.
*Cf. Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999) ("Shackelford has
demonstrated a tight temporal proximity between her protected activity and her termination.
Shackelford was fired on October 13. This is the same day on which Shackelford alleges that
Korioth, her supervisor, overheard her speaking on the phone with the class action plaintiffs'
counsel; one day after she attempted to set up a meeting with her supervisors to discuss racial
discrimination against her; and one week after she was listed as a potential witness in the class action
suit."); *see also United States ex rel. Feaster v. Dopps Chiropractic Clinic, LLC*, No. 13-1453-EFM-KGG,
2015 WL 6801829, at *8 (D. Kan. Nov. 5, 2015) (dismissal of FCA retaliation claim denied where
"Feaster alleges that Defendants unilaterally revoked his status as an employee, designated him an
independent contractor, and declared a less favorable method for determining his compensation.
Regarding the motive for these changes, Feaster alleges that Defendants altered his employment
conditions to punish him for opposing Defendant's billing practices.").

Under these circumstances, plaintiff successfully has pled that he took steps to prevent fraud that could eventually lead to FCA litigation; that defendants were aware of plaintiff's efforts no later than the start of the internal investigation; and that defendants fired plaintiff because he took his concerns all the way up to the parent company's CEO.  Plaintiff will have to substantiate his allegations during discovery, of course, but for now, his amended complaint states a cognizable retaliation claim.[3]

### C.  The FCA and Extraterritoriality

Finally, the Court will consider whether extraterritoriality requires dismissal of an otherwise cognizable claim.  "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.  This principle represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate.  It rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign, matters.  Thus, unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions.  The canon or presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law.  When a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison*

---

[3] Moog has challenged a portion of the *ad damnum* clause of the amended complaint that seeks permanent injunctive relief.  (Dkt. No. 19-1 at 20.)  To the extent that the Court needs to address the matter now, it briefly recommends denying this challenge without prejudice to renew during dispositive motion practice at the close of discovery.  *See Troiano v. John Hancock Mut. Life Ins. Co.*, No. 02 CIV. 2921 (JGK), 2002 WL 31165087, at *1 (S.D.N.Y. Aug. 26, 2002) ("While the motion purports to be made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure based on an allegation that the Complaint fails to state a claim upon which relief can be granted, the motion does not seek to dismiss any claims for relief but only certain portions of the relief sought for the claims stated.").

*v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (internal quotation marks and citations omitted). "To survive [Moog's] motion to dismiss, [plaintiff] must demonstrate either (1) that the facts alleged in his complaint state a domestic application of the antiretaliation provision of the [FCA], or (2) that the antiretaliation provision is intended to apply extraterritorially." *Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 179 (2d Cir. 2014); *see also Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993) ("[T]he presumption against extraterritoriality is not applicable when the conduct regulated by the government occurs within the United States. By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders. Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States.") (citations omitted).

Here, plaintiff has satisfied the first prong from *Liu*, making review of the second prong unnecessary. Domestic application in the *Liu* case failed because "Liu is a resident of Taiwan employed by the Chinese subsidiary of a German company; he reported to superiors in China and Germany regarding allegedly corrupt activities that took place in China, North Korea, and Hong Kong; and his employers decided, apparently in China and/or Germany, to terminate his employment. In short, the whistleblower, his employer, and the other entities involved in the alleged wrongdoing are all foreigners based abroad, and the whistleblowing, the alleged corrupt activity, and the retaliation all occurred abroad. The facts alleged in the complaint reveal essentially no contact with the United States regarding either the wrongdoing or the protected activity." *Liu*, 763 F.3d at 179. The plaintiff in *Liu* could not rescue his allegations through a "slim connection to the United States" consisting of a listing of one class of the defendant's securities on the New York Stock Exchange. *Id.* In contrast, plaintiff here has pled that he worked both for Moog and Moog

Shanghai and that he reported to Moog's headquarters in Elma.  The "counterfeit parts" that plaintiff allegedly uncovered originated in China but had Boeing, a domestic corporation, and the Department of Defense as the ultimate destinations.  *Cf. Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 953–54 (9th Cir. 2008) ("[W]hen deciding whether a statute implicates the presumption against extraterritoriality, courts must determine whether application of that statute would govern conduct occurring abroad.  Appellants have failed to show that GARA [General Aviation Revitalization Act] regulates any non-domestic conduct, because GARA only determines the scope of a manufacturer's liability in American courts.") (citation omitted).  In an era of increasingly global supply chains, the origin of raw materials or components should not alone decide the territoriality of a claim under the FCA.  Some consideration should be given to how the United States government purchases defective finished goods at full price and how those defective goods can have catastrophic consequences in the United States.  *Cf. Massey*, 986 F.2d at 532 ("NEPA [National Environmental Policy Act] is designed to control the decisionmaking process of U.S. federal agencies, not the substance of agency decisions.  By enacting NEPA, Congress exercised its statutory authority to determine the factors an agency must consider when exercising its discretion, and created a process whereby American officials, while acting within the United States, can reach enlightened policy decisions by taking into account environmental effects.  In our view, such regulation of U.S. federal agencies and their decisionmaking processes is a legitimate exercise of Congress' territoriality-based jurisdiction, and does not raise extraterritoriality concerns.").  When plaintiff's immediate supervisor, Zou, allegedly ignored the concerns that he raised, plaintiff brought his concerns to the attention of officials at Moog.  The resulting internal investigation was coordinated by Moog from headquarters in Elma.  Finally, while plaintiff lives in China and was fired in China, he was fired one day after he brought his concerns to the attention of Moog's CEO in Elma.  As with the other merits of his

allegations that the Court discussed above, plaintiff has some work to do to substantiate his allegations of domestic application during discovery. For now, though, plaintiff has alleged enough domestic connections to frame this case as a domestic application of the FCA.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying Moog's motion (Dkt. No. 19).

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

_\_\_/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: September 19, 2019