UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CHARLES SHI,

      Plaintiff,

  v.                                                                                              19-CV-339
                                                                                                      DECISION & ORDER
MOOG, INC., and MOOG CONTROL
SYSTEM (SHANGHAI) CO. LTD.,

      Defendants.

---

On January 11, 2019, the plaintiff, Charles Shi, commenced this action under the Federal False Claims Act ("FCA").  Docket Item 1.  On June 20, 2019, defendant Moog, Inc. ("Moog"), moved to dismiss, Docket Item 19;[1] on July 26, 2019, Shi responded, Docket Item 28; and on August 19, 2019, Moog replied, Docket Item 29.

On August 20, 2019, the case was referred to United States Magistrate Judge Hugh B. Scott for all proceedings under 28 U.S.C. §§ 636(b)(1)(A) and (B).  Docket Item 30.  On September 19, 2019, Judge Scott issued a Report and Recommendation ("R&R") finding that Moog's motion should be denied.  Docket Item 33.

On November 4, 2019, Moog objected to the R&R on the grounds that it (1) "assumes facts that do not appear in the [a]mended [c]omplaint and draws unwarranted and illogical factual inferences in Shi's favor," and (2) "incorrectly concludes that this case presents a domestic application of the FCA's anti-retaliation provision—and thus is not precluded by the presumption against extraterritorial application of United States

---

[1] The other defendant—Moog Control System (Shanghai) Co. Ltd.—has not appeared in this action.

statutes." Docket Item 36 at 6. On December 9, 2019, Shi responded to the objection, Docket Item 40, and on January 10, 2020, Moog replied, Docket Item 41.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). A district court must review *de novo* those portions of a magistrate judge's recommendation to which an objection is raised. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R, the record in this case, the objection and response, and the materials submitted to Judge Scott. Based on that *de novo* review, the Court accepts and adopts Judge Scott's recommendation to deny Moog's motion.

## **DISCUSSION**

The Court assumes the reader's familiarity with the facts alleged in the amended complaint, *see* Docket Item 9, and Judge Scott's analysis in the R&R, *see* Docket Item 33.

## I. THE AMENDED COMPLAINT STATES A RETALIATION CLAIM UNDER THE FALSE CLAIMS ACT.

To survive a motion to dismiss, a complaint must include sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for

more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).[2]

To state a claim for retaliation under the FCA, a plaintiff "generally [must] show that (1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017). "The inquiry as to whether an employee engaged in protected conduct involves determining whether an employee's actions sufficiently furthered an action filed or to be filed under the FCA, and, thus, equated to 'protected conduct.'" *United States ex rel. Scharff v. Camelot Counseling*, No. 13-CV-3791 (PKC), 2016 WL 5416494, at *10 (S.D.N.Y. Sept. 28, 2016) (quoting *McAllan v. Von Essen*, 517 F. Supp. 2d 672, 685 (S.D.N.Y. 2007)). "'Protected activity' is interpreted broadly, and 'an employee's activities may be protected even where an FCA suit has not been filed.'" *Id.* (quoting *Faldetta v. Lockheed Martin Corp.*, 2000 WL 1682759, at *12 (S.D.N.Y. Nov. 9, 2000)); *see also Dhaliwal v. Salix Pharm., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (summary order) (explaining that the FCA prohibits "retaliation against not only those who actually file a qui tam action, but also against those who plan to file a qui tam that never gets filed,

---

[2] Although fraud claims typically are subject to the stricter pleading requirements of Federal Rule of Civil Procedure 9(b), retaliation claims under the FCA are evaluated under the plausibility standard. *See United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017) ("The particularity requirement of Rule 9(b) does not apply to retaliation claims under the FCA." (citing *Weslowski v. Zugibe*, 626 F. App'x 20, 20 (2d Cir. 2015))); *see also Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (explaining that FCA retaliation claims "need pass only [Federal Rule of] Civil Procedure 8(a)'s relatively low notice-pleadings muster—in contrast to Rule 9(b)'s specificity requirements").

who blow the whistle internally or externally without the filing of a qui tam action, or who refuse to participate in the wrongdoing" (quoting *Chorches*, 865 F.3d at 97)).

Thus, it is sufficient "to show that [a plaintiff's] investigation reasonably *could have* led to a[n] FCA action." *Dhaliwal*, 752 F. App'x at 100 (emphasis added) (quoting *United States ex rel. Wood v. Allergan, Inc.*, 246 F.Supp.3d 772, 831 (S.D.N.Y. 2017), *rev'd on other grounds*, 899 F.3d 163 (2d Cir. 2018)). "Simply put, the plaintiff must demonstrate that [his] investigation, inquiries, and/or testimony were directed at exposing a fraud upon the government." *Scharff*, 2016 WL 5416494, at *10 (quoting *Grant v. Abbott House*, 2016 WL 796864, at *7 (S.D.N.Y. Feb. 22, 2016)).

With respect to the second element, the plaintiff "must plausibly allege 'that [he] was discharged because of activities [that] gave the employer reason to believe that [he] was contemplating a qui tam action against it.'" *Id.* (quoting *Garcia v. Aspira of New York, Inc.*, No. 07 CIV. 5600 PKC, 2011 WL 1458155, at *5 (S.D.N.Y. Apr. 13, 2011)). The plaintiff "also must allege that the employer knew that [he] 'was engaging in protected conduct.'" *Id.* (quoting *Faldetta*, 2000 WL 1682759, at *13).

Moog argues that the amended complaint "provides no factual detail as to *how* [the] alleged sale of deficient airplane parts to [the] defendants made their way into United States military planes." Docket Item 36 at 8 (emphasis in original). As a result, Moog says, Shi does not adequately allege that he was engaged in protected conduct or that the defendants were aware that he was engaged in protected conduct. *Id.* at 11-14. Moog further contends that the R&R "fails to address Moog's argument that . . . [Shi's] notifications to [the] defendants about his suspicions of [the] improper manufacturing and documentation practices [of Suzhou New HongJi Precision Parts

4

Co., Ltd. ('NHJ')—one of Moog's suppliers] were insufficient to raise concerns about potential false claims to the United States." *Id.* at 14. In Moog's view, "Shi only raised concerns about NHJ's conduct. He never complained or raised concerns that Moog was actually or potentially defrauding the government." *Id.* (emphasis omitted). And "[w]ithout such warning," Moog claims, it "cannot have been on notice that Shi was contemplating a qui tam action against it, and Shi did not plead the second prong of an FCA retaliation claim." *Id.*

But Moog asks more of Shi than the law requires. As Judge Scott explained, although

> [t]he amended complaint contains little detail about what Moog actually does for the Department of Defense, . . . a basic supply and manufacturing chain is apparent. Moog Shanghai obtains airplane parts from various Chinese companies. Moog Shanghai, with some level of coordination or supervision from Moog, then manufacturers airplanes as a subcontractor of The Boeing Company ("Boeing"). Whether Moog and its subsidiaries manufacture the unspecified airplanes in whole or in part is not clear from the amended complaint. Ultimately, though, Boeing delivers the finished airplanes to the Department of Defense under various contracts that Boeing has with the federal government.

Docket Item 33 at 3; *see also* Docket Item 9 ¶ 25 (alleging that "[i]n order to fulfill . . . contracts with the U.S. government, Boeing often utilizes subcontractors for the manufacturing of airplanes" and "[d]efendants Moog, Inc. and Moog Control System (Shanghai) Co. Ltd., are such subcontractors used by Boeing"). According to the amended complaint, Shi became aware that NHJ was using a subcontractor that "did not properly bake parts both before and after the cadmium plating process, and forged production process cards." Docket Item 9 ¶ 85. Shi "noted a complete loss of material traceability, which included a pattern of unapproved metals, metallurgical processes,

5

failure to properly document the source of metals used in production, and falsification of such records." *Id.* ¶ 41.  Shi also suspected that Moog's Asia Supply Chain Manager was "colluding with NHJ and potentially receiving illegal kickbacks." *Id.* ¶¶ 27, 67.  Shi reported his concerns to various superiors and, ultimately, to Moog's CEO. *Id.* ¶¶ 43-68.  Shi was fired the next day. *Id.* ¶¶ 69-70.

This Court agrees with Judge Scott that "[a] reasonable inference from th[ese] allegation[s] is that NHJ wanted to be paid full price for substandard work, creating a cascade effect in which Moog Shanghai, Moog, Boeing, and ultimately the Department of Defense would all pay full price for what they thought were military airplanes that met all required specifications." Docket Item 33 at 14.  And "[a]nother reasonable inference from [these] allegations is that if the Department of Defense knew about planes containing defective spoiler blocks then it either would not purchase the airplanes at all or would demand repairs and a significantly lower price." *Id.*  The question is thus whether those inferences support a plausible claim that Shi's "investigation, inquiries, and/or testimony were directed at exposing a fraud upon the government," *Scharff*, 2016 WL 5416494, at *10 (quoting *Grant*, 2016 WL 796864, at *7), and that Shi "was discharged because of activities which gave [Moog] reason to believe that [he] was contemplating a qui tam action against it," *id.* (quoting *Garcia*, 2011 WL 1458155, at *5). For the reasons that follow, this Court finds that they do.

The amended complaint alleges that Shi repeatedly reported to Moog that NHJ was selling Moog counterfeit parts that might prove dangerous but that Moog continued to use those parts in its products.  Based on the reasonable inferences described above, Shi plausibly has alleged that at least some of those parts were then sold to the

6

Department of Defense—something that Moog well knew.  It is thus also plausible that Shi's intention was to stop a fraud against the government and that Moog was aware that Shi's allegations could lead to a claim under the FCA.  *See United States ex rel. Bonzani v. United Techs. Corp.*, No. 3:16-CV-1730 (JCH), 2019 WL 1440384, at *5 (D. Conn. Apr. 1, 2019) ("Though Bonzani does not allege that he explicitly raised concerns about a violation of the FCA, a reasonable inference could be drawn that, by informing [Pratt and Whitney ('PW')] management that quality testing was being manipulated to pass quality assurance tests, and that PW employees had been 'cheating' and conducting 'false' and 'contractually improper' testing, Bonzani put PW on notice that he had uncovered a potential fraud with FCA implications."); *cf. Dhaliwal*, 752 F. App'x at 101 (explaining that "[a] jury could reasonably infer that the reason Dhaliwal claimed the 'Doc-in-a-Box' program was 'improper' was because it appears to have been a thinly veiled kickback scheme—and thus a violation of the Anti-Kickback Statute and FCA" and reversing the district court "because it did not afford Dhaliwal the benefit of all reasonable inferences as required on a motion for summary judgment").

      To be sure, Moog may have strong factual defenses at a later stage of this case.  But this is a motion to dismiss, and the Court therefore must "accept[ ] all factual allegations as true and draw[ ] all reasonable inferences in favor of the plaintiff."  *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016) (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014)).  And under that standard, this Court finds that Shi

7

adequately has pleaded that he was engaged in protected conduct and that Moog was aware that he was engaged in protected conduct.[3]

Moog also asserts that Shi has not "sufficiently plead[ed] that he was terminated for . . . protected conduct." Docket Item 36 at 14. In support of that proposition, Moog argues that

> [t]he R&R emphasizes the short timeframe between Shi's disclosure to Moog's CEO and his termination to conclude that Shi was fired because of his NHJ investigation. But this analysis ignores that Shi admittedly first raised concerns about NHJ more than six months before his termination. . . . . Far from supporting Shi's claim, the *lack* of temporal proximity between the "protected conduct" and his termination precludes an inference that Shi's termination was retaliation for reporting NHJ's conduct.

*Id.* (emphasis in original) (internal citations omitted).

But Moog does not explain why the relevant starting point is when Shi *first* raised his concerns, as opposed to when those concerns were relayed to the CEO. Nor does Moog explain why the extremely close temporal proximity between Shi's report to the CEO and Shi's firing (just one day) should not factor against Moog—particularly at the motion to dismiss stage.

For all those reasons, this Court agrees with Judge Scott that Shi adequately has pleaded a claim under the FCA.

---

[3] Alternatively, this Court could allow Shi to amend his complaint to include allegations, upon information and belief, that at least some of the NHJ parts would be sold to Boeing and ultimately used in planes sold to the Department of Defense. Such an exercise would be a waste of time, however, as those allegations can reasonably be inferred from the amended complaint.

## II.   THE CLAIMS ARE NOT PRECLUDED BY THE PRESUMPTION AGAINST EXTRATERRITORIALITY.

Judge Scott also correctly found that Shi's claims are not barred by the presumption against extraterritoriality. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) ("It is a 'longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' . . . When a statute gives no clear indication of an extraterritorial application, it has none." (quoting *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991))).

As Judge Scott explained, "[t]o survive [Moog's] motion to dismiss, [Shi] must demonstrate either (1) that the facts alleged in his complaint state a domestic application of the antiretaliation provision of the [FCA], or (2) that the antiretaliation provision is intended to apply extraterritorially." Docket Item 33 at 18 (quoting *Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 179 (2d Cir. 2014)); *see also Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993) ("[T]he presumption against extraterritoriality is not applicable when the conduct regulated by the government occurs within the United States. By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders. Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States."). Based on the allegations in the amended complaint, this Court agrees with Judge Scott that Shi "has satisfied the first prong from *Liu*, making review of the second prong unnecessary." Docket Item 33 at 18. More specifically,

> When [Shi]'s immediate supervisor . . . allegedly ignored the concerns that he raised, [Shi] brought his concerns to the attention of officials at Moog. The resulting internal investigation was coordinated by Moog from headquarters in Elma[, New York]. Finally, while [Shi] lives in China and was fired in China, he was fired one day after he brought his concerns to the attention of Moog's CEO in Elma.

*Id.* at 19.

Once again, it may well be that at a later stage of the case, Moog will be able to show that there was no wrongdoing—let alone wrongdoing that occurred in the United States. But based on *the allegations in the complaint*, such a determination is premature. *See id.* at 19-20 (Judge Scott's explaining that "[a]s with the other merits of [Shi's] allegations that the Court discussed above, [Shi] has some work to do to substantiate his allegations of domestic application during discovery," but "[f]or now, [Shi] has alleged enough domestic connections to frame this case as a domestic application of the FCA").

## **CONCLUSION**

For the reasons stated above and in the R&R, Moog's motion to dismiss, Docket Item 19, is DENIED. The case is referred back to Judge Scott for further proceedings consistent with the referral order of August 20, 2019, Docket Item 30.

SO ORDERED.

Dated:   September 24, 2020
         Buffalo, New York


         */s/ Lawrence J. Vilardo*
         LAWRENCE J. VILARDO
         UNITED STATES DISTRICT JUDGE

10